JOHN R. HUFFMAN ᴇᴛ ᴀʟ *v.* STATE ROADS COMMISSION.

*Conowingo Bridge—Relocation—Powers of State Roads Commission—Disposal of Property—County Commissioners—Joinder in Agreement—Rights of Property Owners.*

Acts 1910, ch. 116, authorizing and directing the State Roads Commission "to acquire by purchase, condemnation or otherwise (and to maintain when so acquired) the Conowingo bridge across the Susquehanna River," does not require the bridge to remain at that point until the Legislature itself directs its abandonment.                                    pp. 580, 581

Acts 1908, ch. 141, creating the State Roads Commission, gives the commission power to relocate highways, and since this would include the approaches to the Conowingo bridge, it necessarily authorize the relocation of the bridge itself.        p. 581

The requirement in Acts 1910, ch. 116, that the commission "maintain" the Conowingo bridge when acquired by it, means that the commission must, so long as the bridge is used as a communication between state highways, keep it in safe repair, and not that, when it becomes desirable to relocate the highway approaches, and to connect these by a bridge, the commission cannot abandon the old and useless bridge.          p. 581

Any duty upon the commission to maintain the Conowingo bridge necessarily terminates when, by the exercise by a power company of the authority given it by Acts 1908, ch. 268, to erect a dam which will flood and destroy the bridge, it becomes impossible to maintain it.                              p. 582

The power to relocate roads, given the State Roads Commission by Acts 1908, ch. 141, is not confined to projected locations, but includes the power to change the location of a road previously established by the commission.              pp. 582, 583

The word "person" may include the state, when such an intention is manifest.                                    p. 584

The State Roads Commission, being authorized by Code, art. 91, sec. 28, to make all "contracts, agreements or stipulations germane to the scope of its duties and powers under this act," has authority to dispose of worn out, disused, or antiquated property.                                                  pp. 584, 585

When the Conowingo bridge was about to be rendered useless by the construction of a dam by a power company, under legislative authority, the commission, having power to dispose of disused property, could agree with the power company to accept, in place of the bridge and approaches destroyed by the dam, another bridge and approaches, so located as to serve the public convenience.                                       p. 585

Acts 1908, ch. 208, authorizing the Susquehanna Power Company to acquire such property as it might need for its dam "from any person or corporation, public or private," by further providing that no property belonging to the state should be acquired without the assent of the board of public works showed that the quoted words included the state.             pp. 585, 586

County commissioners could properly join in an agreement for the purpose of releasing a power company from any claim for damages on account of the flooding of county roads by the construction of a dam, in consideration of the relocation of such roads by the company to the satisfaction of the commissioners.
                                                              p. 586

Property owners, not shown to be abutters, have no vested right to have a bridge and its approaches maintained in the existing location, and the vacation or abandonment thereof, under proper authority, without compensation to them, does not deprive them of their property without due process of law, especially where it inflicts upon them no inconvenience or damage not suffered by the public generally.             pp. 586, 587

*Decided March 22nd, 1927.*

Appeal from the Baltimore City Court (OWENS, J.).

Petition for mandamus by John R. Huffman and others against the State Roads Commission of Maryland. From an order dismissing the petition, the petitioners appeal. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Isaac Lobe Straus,* for the appellants.

*Thomas H. Robinson, Attorney General,* and *Charles Mc-Henry Howard,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The Susquehanna Power Company, herein referred to as the "power company," a Maryland corporation, on November 2nd, 1925, duly executed a written "preliminary" agreement with the State Roads Commission of Maryland, herein called the commission, the Board of Public Works of the State of Maryland, the County Commissioners of Harford County, and the County Commissioners of Cecil County, for the relocation of the bridge now spanning the Susquehanna River at Conowingo, of the approaches thereto, and of certain public highways connecting therewith. Under that agreement the power company contracted (1) to provide a highway bridge across the Susquehanna River, connecting Cecil and Harford Counties, having a roadway twenty feet wide between curbs, a capacity of two twenty-ton trucks on each span, and with a sufficient clearance above flood level to insure safety to traffic. (2) At one of the three following locations: "(*a*) At or about the same location as the present Conowingo bridge; (*b*) below the dam site near Shure's Landing; (*c*) over and supported on the dam structures." (3) To construct roads connecting each end of the proposed bridge with the present "Philadelphia-Baltimore Turnpike." (4) To deed to the State Roads Commission a fifty-foot right of way for the new roads to the new bridge. (5) To convey to the commission the new bridge if constructed separately from the dam, or if constructed as an integral part of the dam structure to lease it to the commission at an annual rental of one dollar, for a term equal to the term of the federal license to the power company. (6) To construct the road leading to the bridge on the east side of the river under or over the

Pennsylvania Railroad tracks so as to avoid a grade crossing. And (7) until the new bridge is completed to keep unobstructed openings sufficient to take care of the normal high flow of the river.

The commission and the counties on their part agreed as follows, that is to say:

"1.   They will convey to the company the present Conowingo bridge, and all land, abutments, approaches and rights connected therewith, and constituting said bridge property and premises, together with such parts of the state and county road approaches thereto, as may be necessary or useful to the Conowingo project, all to be free and clear of all encumbrances.   It is understood, however, that the company will make a satisfactory substitution as shall be later agreed upon between the company and the commission for the toll houses and land appurtenant thereto at each end of the present Conowingo bridge and also for a strip of land in the Fifth District of Harford County acquired by the commission for a then contemplated road connecting with the Harford approach to said bridge.

"2.   They will also duly release the said company from any and all damages resulting from the overflow by said company's dam of any and all state or county roads in the contiguous or nearby election districts of said counties which end at the water's edge, but contiguous county roads so overflowed shall be relocated and new bridges provided at the expense of the company and satisfactory to the counties; yet by said releases restraining access in themselves respectively to the new pool along the river created by the company's dam, and where such access is retained, providing reasonable parking ground.

"The Board of Public Works joins in the agreement for the purpose of assenting thereto and certifying its approval thereof."

Assuming to act under that agreement, the commission elected to have the new bridge constructed on the dam at Shure's Landing, something over two miles below the present

Conowingo bridge. Shortly after that action had been taken, on September 1st, 1926, John R. Huffman, and other citizens and tax payers of Harford and Cecil Counties, as individuals, and also as constituting the executive committee of the Conowingo Protective Association, filed in the Baltimore City Court a petition for a writ of mandamus commanding and requiring the State Roads Commission

> "to observe, obey and carry out the said provision, direction and requirement of said Act of the General Assembly of 1910, ch. 116, to maintain the said Conowingo bridge, as aforesaid, and, to that end, preventing and restraining the said defendant commission from carrying out and executing the said alleged agreement with the Susquehanna Power Company, and particularly from disposing of and conveying said Conowingo bridge to said Susquehanna Power Company, and from permitting, authorizing or doing any act leading to or resulting in the relinquishment, abandonment, or destruction of said Conowingo bridge, or its removal from its present location at Conowingo, over said Susquehanna River between said Harford and Cecil Counties, and commanding and requiring said commission to obey, carry out and give effect to the direction and requirement of said Act of the General Assembly of 1910, ch. 116, with respect to the maintenance of said Conowingo bridge over the Susquehanna River at Conowingo as a part of the state roads system."

The defendant filed an answer to that petition, and to that answer the petitioners demurred. The demurrer coming on for a hearing, the court, on December 29th, 1926, overruled it, and being of opinion that the petition did not present a case upon which the writ of mandamus should issue as prayed, and the petitioners neither desiring nor applying for leave to amend their petition, it dismissed the petition and ordered judgment to be entered for the defendant, from which judgment this appeal was taken.

Broadly speaking, it will be observed that the defendant,

and the other parties to the agreement in this case, propose and are undertaking to do two things, (1) to discontinue and abandon the present Conowingo bridge and the approaches thereto, and parts of the public highways connected by said bridge, to convey to the power company the entire present Conowingo bridge and all property and rights connected therewith and comprising the same, and to release said company from all damages occasioned by the overflow of county or state roads by the waters impounded by the company's dam; (2) to relocate said bridge and the highways connecting the same, so that the new bridge will be located at a point some two miles down the river from the present bridge; and the single question raised by the appeal is whether they have the power to do either or both of those things.

Whether they have or not depends upon the force and effect to be given to the language (*a*) of the Public General Laws of the state, creating and defining the powers and duties of the commission, (*b*) to the language of the charter and statutes creating and defining the powers of the power company, and (*c*) to the language of chapter 116 of the Acts of 1910, and (*d*) to some extent to the statutes creating and defining the powers and duties of the County Commissioners of Harford and Cecil Counties and of the Board of Public Works. But before attempting any analysis of those statutes, we will refer briefly to the facts of the case as set out in the petition, because the case was disposed of on the theory that all the facts therein alleged are true, but that conceding their truth, they are insufficient to warrant the issuance of the writ of mandamus as prayed.

No objection was made in this court to the right of the appellants to maintain this proceeding, if their contention that the acts of the appellees were wholly *ultra vires* and void is correct, and as we are of the opinion that in such a case they would have such a right, we need not notice those allegations of the petition which deal with the status of the several petitioners.

The petition, after referring to various public general and public local laws, and charters pertinent to the questions before us, and after outlining the history of the Conowingo bridge for approximately "three quarters" of a century, in part alleges that—

"As a consequence of said conditions and the said location of said bridge at its present situation through so many years and generations, all the established and principal interests of the people, including your petitioners and many others in the same situation and plight with themselves, who have settled in communities in said Harford and Cecil Counties, respectively, upon each side of the Susquehanna River in the vicinity of said Conowingo bridge, have developed, adapted themselves to, and become substantially, if not vitally, dependent upon, the continued maintenance of said bridge at said location. These interests of your petitioners and of the large number of said people in the said communities settled upon each side of said river, near said bridge, include their agricultural, mercantile and occupational pursuits and employments, the use and avail of their property, the convenience and enjoyment of their homes and residences, as well as the value thereof, their family, church and educational interests, and a large measure of their community and inter-community activities and relations.

"That if said bridge were destroyed or removed, your petitioners and said numerous other persons, including citizens, property owners and taxpayers as aforesaid, in said community on both sides of the river in the vicinity of said bridge, would suffer great and irreparable hardship, privation, loss, injury and damage in all their agricultural, mercantile, business and occupational interests aforesaid, and in loss, damage and injury to their property, as well as in and to their various personal, family, social, community and inter-community interests aforesaid, all of which are, and for many years and generations last past have been, deeply adapted to and dependent upon the said Cono-

wingo bridge and its said present and historic loca-
tion."

It then alleges chapter 116 of the Acts of 1910 and the
conveyance of the bridge and the approaches thereto to the
State Roads Commission in 1911, and its incorporation with
the state roads system, as an integral part thereof. It also
alleges the execution and substances of the agreement re-
ferred to above for the relocation of the bridge, and the ap-
proaches thereto, denies the power of the power company or
the county commissioners to execute the same, refers to inef-
fectual efforts of two of the petitioners to secure a timely
hearing of their objections to the relocation of the bridge,
and the definite determination of the State Roads Commis-
sion to relocate it at Shure's Landing. It further alleges
that the agreement is void (1) because it is contrary to the
Act of 1910, ch. 116; (2) because the State Roads Com-
mission is usurping legislative powers; (3) (4) because the
commission is prohibited by law from disposing of the
Conowingo bridge or relocating it; (5) because the power
company has no power to execute or perform the agreement;
(6) because it is the legal duty of the commission to main-
tain the bridge at its present location; (7) because the exe-
cution of the decision of the commission would deprive the
petitioners of their property without due process of law in
violation of the statutory law, as well as the state and federal
Constitutions; (8) because it would illegally discriminate
against the petitioners "with respect to their property, their
personal security and their rights to the pursuit of happi-
ness, and deny them, in each and all of said respects, the
equal protection of the laws in violation of the Constitution
of the United States"; (9) because the performance of the
agreement would illegally increase the "burdens of taxation
for both state and county purposes upon" the petitioners;
(10) because the performance of the agreement and the
relocation of the bridge in accordance with the decision of
the commission would injure substantially "the agricultural,

mercantile, business, and occupational pursuits and employment of your petitioners and of many other citizens residing in said Harford and Cecil Counties in the vicinity of said Conowingo bridge, and greatly depreciate the value of their property and businesses, and greatly prejudice, impair, and injure the proper and due use, enjoyment, and avail of their property, and seriously and permanently injure the personal and community interests of your petitioners and those similarly situated with them, without authority or warrant of law * * * and in denial to these petitioners and those in the same situation with them of the equal protection of the laws, and in deprivation of their property and their right to the pursuit of happiness without due process of law," and (11) because "the execution of said determination and intention of said defendant commission would so actually, seriously, and completely destroy the property and the property rights of your petitioners and of said other owners of property in the communities aforesaid, by preventing and destroying the proper and reasonable use, enjoyment, and avail of their said property for purposes of residence, agriculture, and other businesses and pursuits, as to constitute a taking of their said property without compensation therefor, as required by article 3, section 40, of the Constitution of Maryland, as well as by article 23 of the Declaration of Rights of Maryland, and in violation of said provisions of the Constitution and Declaration of Rights."

It then alleges that the "uncompensated" destruction and loss of the present bridge and the highway approaches thereto, and the necessity for constructing new highways to approach the proposed bridge, would illegally increase the "burdens of both state and county taxes upon" the petitioners and the other taxpayers of the two counties, and that it would be practicable and economical to utilize the structure of the present bridge in constructing another bridge in the same location at a sufficient elevation to permit traffic to use it in safety. Finally, it alleges the necessity for the issuance of the writ of mandamus to protect the petitioners from the

alleged wrongful and illegal acts threatened by the defendants.

The validity of the agreement involved in this case depends to some extent upon the powers of the several public agencies and corporations which executed the same, and as those powers are either immediately or derivatively statutory, it is necessary to examine the statutes creating them to ascertain their extent.

The State Roads Commission was created by chapter 141 of the Acts of 1908, which provided for the establishment of a "system of public roads and highways in Maryland" and which undertook to grant to such commission "full powers to construct, improve, and maintain public roads and highways" in the several counties in this state. And by that act the following specific powers were expressly conferred upon the commission, that is to say, in sub-section 32B it provided that, in addition to its other powers, the commission—

"shall have full powers and be charged with the full duties to select, construct, improve and maintain such a general system of improved state roads and highways, as can reasonably be expected to be completed with the funds herein provided in and through all the counties of this state; * * * condemn, lay out, open, establish, construct, extend, widen, straighten, grade and improve, in any manner, any main road of the system in any county of this state, and establish or fix the width thereof; * * * acquire for the State of Maryland, by agreement, gift, grant, purchase or condemnation proceedings as prescribed by sections 251 to 256, inclusive, or by section 360 to 366, inclusive, of article 23 of the Code of 1904, of the Public General Laws, any private roads or roads whatsoever, or private property or rights of drainage for public use, whether belonging to private individuals, or to turnpike companies or other corporations, and including any avenues, roads, lanes or thoroughfares, rights or interests, franchises, privileges or easements, that may be, in its judgment, desirable or necessary to complete said system of roads or to carry out the purposes of

this act; contract with any person or persons, company
or corporation, either private or quasi-public, or mu-
nicipal, in furtherance of the duties and objects of this
act or any of the same; * * * make and enter into any
and all contracts, agreements or stipulations germane
to the scope of its duties and powers under this act."

By chapter 116 of the Acts of 1910 (section 48, article
91, C. P. G. L. of 1911) omitted from the edition of 1924,
it was granted these additional powers:

"Sec. 32-P. For the purpose of making and main-
taining connections between any highways or the parts
of any highway constructed or improved under the pro-
visions of the preceding sections, the State Roads Com-
mission shall have the power to build bridges; and to
acquire by purchase, condemnation or otherwise (and
to maintain when so acquired) any existing bridges
along the line of, or connected with any such highway
or highways. And in the exercise, but not in limita-
tion of the power hereby granted, the State Roads
Commission is authorized and directed for the pur-
pose of connecting the system of state roads in Har-
ford and Cecil Counties, to acquire by purchase, con-
demnation or otherwise (and when so acquired to
maintain) the Conowingo bridge across the Susque-
hanna River, together with all land, roads, approaches,
rights, franchises and easements belonging to any per-
son or corporation, and necessary or convenient for
the purpose aforesaid; or in case the judgment or ver-
dict of condemnation shall be deemed excessive, with
reference to said Conowingo bridge, by the State Roads
Commission, the said commission may within thirty
days after the final judgment or verdict of condemna-
tion shall have been entered, reject the same and then
shall proceed by way of purchase or condemnation,
or both, to acquire any and all necessary approaches
for a bridge across the Susquehanna River and at such
point in the vicinity of the said Conowingo bridge
as may seem best for the public advantage in judg-
ment of said commission, and the said commission to

proceed after acquiring the necessary approaches and
other property rights to erect a new bridge at that
point out of the money available for any purpose
under this section; provided, however, that should the
purchase or condemnation of said bridge, or the build-
ing of a new bridge in lieu thereof aggregate more
than sixty-five thousand dollars, then such amount as
shall exceed said sum of sixty-five thousand dollars
shall be contributed equally by the counties of Harford
and Cecil."

In sub-section 32-X, chapter 501, Acts of 1910 (Bagby's
Code, art. 91, sec. 41), it is provided:

"It shall be lawful for the State Roads Commission
to make, from time to time, such changes as it may
seem desirable in the projected locations of any road
authorized to be constructed hereunder."

Section 29, article 91, Bagby's Code, provides:

"If the State Roads Commission shall determine
that the public necessity or convenience, or that the
purpose of this act require * * * that any public road
in whole or in part in any county or counties, and
forming a section of a through route or continuous
thoroughfare between two or more important points
in the state, should be taken charge of by said com-
mission for the state for the purposes of this act; * * *
said commission thereupon without any further proced-
ure shall acquire and take over any such and all county
roads, turnpikes or sections thereof or interests or
rights therein, as in its judgment may be necessary or
proper for the purposes of this act, and with full
power to widen, relocate, change or alter the grade or
location thereof."

Section 92, article 91, Bagby's Code, provides that—

"The State Roads Commission is hereby authorized
and directed to ask for bids and enter into contracts
in the usual form for the construction of such bridges

and railroad grade crossings as it may from time to time under the provisions hereof determine to construct or eliminate."

The county commissioners of the several counties of Maryland are given "charge and control over county roads and bridges," as well as the "property owned by the county," and constitute a corporation. Article 25, secs. 1, 2, 13 and 14, Bagby's Code.

The Board of Public Works is a governmental agency of the State of Maryland, and is composed of the Governor, Comptroller, and Treasurer, with such duties as may be from time to time fixed by law.

The Susquehanna Power Company, a corporation, was incorporated under the general incorporation laws of this state—

"to acquire by purchase or otherwise to own, possess and maintain, construct, equip and develop, to continue, operate and manage all and singular the properties, powers, rights, immunities, faculties, privileges and franchises heretofore granted to or acquired by Susquehanna Power Company, a corporation, heretofore organized and existing in pursuance and in accordance with the provisions of all and singular the charters of the said corporation, together with the amendments and supplements to said charter and also in accordance with and pursuant to all and singular the provisions of the general laws of the State of Maryland, applicable thereto."

And it succeeded to the rights, privileges, and franchises of the Susquehanna Power Company, an older corporation existing under and by virtue of certain acts of the General Assembly of Maryland, which are referred to in chapter 268 of the Acts of 1908. Among the powers granted or recognized by the act last referred to were these:

"A power to locate a dam or dams in, along or across the bed and shores of said river, and the canals, ferries and highways thereon or there along, at any points

between tidewater and Mason and Dixon's Line, but also the power to condemn the property set forth in section 3 of said Act of 1900, chapter 248, of any person or corporation whomsoever and wheresoever situate, without any exception whatever, for the location and construction anywhere between tidewater and Mason and Dixon's Line, of any dam or dams in, along or across the said river, and the bed and shores thereof and the canals, ferries and highways thereon there along or leading thereto"; and the power "to locate and build in, along or across the said river and the bed and shores thereof and the canals, railroads, ferries and highways thereon, there along or leading thereto, any dam or dams the crest or crests of which shall not exceed an elevation of one hundred and ten (110) feet above mean low tide at Havre de Grace, said dam or dams to be located at any points between tidewater and Mason and Dixon's Line, together with all necessary power plants and works, appurtenances and accessories and to such ends to acquire all necessary property of every kind and description whatsoever of any person or of any corporation, public or private, as if expressly named herein, whomsoever or wheresoever situate, either in fee simple absolute or for the use thereof in fee simple, or for a lesser estate or interest, at its selection, either by purchase or by condemnation, * * * and to thereby develop and utilize the whole or any part of the water power of said river and apply the same by any lawful means to its full extent to the generation of electrical power or energy, and the transmission, disposal and sale thereof to the public."

The contention of the appellants, as we understand it, rests upon two propositions: (1) That the effect of chapter 116 of the Acts of 1910 is to require the State Roads Commission to keep and maintain, at the location of the existing Conowingo bridge, a bridge and highway approaches thereto adequate to take care of the needs of the usual traffic at that point until such time as the Legislature shall permit it to be

abandoned, and that the Legislature has not given such permission; (2) that no one of the parties to the agreement for relocating the bridge had the power to execute it, and that it therefore is a nullity.

The first proposition appears to rest mainly upon the construction which the able and learned counsel for the appellants gives to the word "maintain," as used in the Acts of 1910, his contention being that when used in connection with the Conowingo bridge, the Legislature by the use of the word "maintain" in that act intended that the bridge should remain at that point as a connection between the highways of Cecil and Harford Counties, until "the Legislature itself authorized and directed its abandonment."

Assuming that that contention involves the necessity for some legislative act other than those already referred to, it is for several reasons untenable: First, it would limit and restrict the power vested in the commission to relocate the highways and bridges of the state whenever in its discretion such relocation would promote the public safety or convenience, notwithstanding that the Legislature expressly declared that the powers given the commission in respect to the Conowingo bridge should be in the exercise of but not in limitation of the general powers granted it in respect to bridges. Now by the same act the commission was given the power to build bridges and to acquire all property necessary therefor, and to acquire bridges already built, "for the purpose of making and maintaining connections between any highways or the parts of any highway constructed or improved under the preceding sections." The reference to "preceding sections" was necessarily to the sections designated in chapter 141 of the Acts of 1908, as sections "32-A" to "32-O", inclusive, for it could have been to nothing else. And those "preceding sections" gave to the State Roads Commission the widest powers in locating and relocating public highways forming part of the state roads system, and necessarily so. For if it were necessary for the commission to secure the express and specific assent of the Legislature to each particular change proposed in the location of any part of a highway, it would

be impossible for it to adequately perform the duty of establishing and constructing a state highway system adequate to the needs of the people and reasonably commensurate with the expenditure of the vast sums of money appropriated by this State for the construction, and maintenance of such a system. As a matter of common sense the Legislature knew that, and it knew too, that the power of deciding where a road should be located, or whether it should be relocated, must be delegated to some administrative agency, if the purpose of the act was to be carried out, and it accordingly delegated it to the State Roads Commission. And in our opinion the right of the State Roads Commission to locate and relocate highways under the statutes referred to above is too clear for controversy or comment. Assuming that they did and do have that power, in the face of its express statement to the contrary, we cannot assume that the Legislature intended to deprive the commission of it with respect to the approaches to the Conowingo bridge by requiring it to "maintain" that bridge at its present location. And yet if "maintain" is given the meaning for which appellants contend, it would have that effect, for it would prevent their relocating the highway approaches to the bridge, since no one could have contemplated the "maintenance" of a bridge without highway approaches as a part of the state highway system.

And again, the word "maintain," as it is used in the state road legislation, does not refer to time but to condition. It may mean, and as there used was evidently intended to mean, to keep up, to preserve, to bear the cost of, to keep unimpaired, to keep in good order. Its obvious purpose was to provide that so long as the bridge at that point was used as a connection between state highways, the commission should keep it in safe repair, but it did not mean that, when in the judgment of the commission acting in the public interest it became desirable to relocate the highway approaches to it, and to connect those approaches by a bridge, that they could not abandon the old and useless bridge and make that change. *Whalen v. Balto. & O. R. Co.,* 112 Md. 198.

Moreover, the conditions existing at the time the Act of

1910 was passed preclude the construction contended for. At
that time the Susquehanna Power Company had, under the
Act of 1908, the power to build a dam to a height of one
hundred and ten feet above mean low tide at any point be-
tween tidewater and the Mason and Dixon's Line.    The ex-
ercise of that power would have flooded the Conowingo bridge,
and utterly destroyed its usefulness as a connecting link in
the system of state highways.    There is nothing in chapter
116 of the Acts of 1910 to warrant the inference that it was
intended to repeal any part of chapter 268 of the Acts of
1908, but the right to flood and destroy the bridge is wholly
inconsistent and irreconcilable with its continued existence as
a highway.    And since the right of the power company to
flood the bridge existed when the Legislature directed the
State Roads Commission to "maintain" the bridge at or near
Conowingo, it could only have meant that it was to maintain
it until the power company legally exercised its right to flood
it.    And as soon as that company, acting under the same
authority as that which imposed the duty, made it impossible
for the appellee to perform the duty of maintaining the Cono-
wingo bridge, it was discharged from the further perform-
ance thereof.    The latter part of section 32-P, chapter 116 of
the Acts of 1910, which directs the location of a new bridge
"in the vicinity of" the present bridge, is not relevant to the
question, because that clause was in the alternative and only
became operative in the event that the commission decided
that the amount awarded in any condemnation proceeding
for the acquisition of the present bridge was excessive, and
rejected the award.

It may be said that the power to relocate roads, given by
the statute, refers only to projected locations, such as are re-
ferred to in section 41 of article 91, C. P. G. L. of Md.
and does not refer to the change of a location once estab-
lished by the commission, but such a construction would not
only be unreasonably narrow, but in actual conflict with other
parts of the same statute.    Section 29, *Ibid.*    Regarded as an
entirety the several acts defining the powers and duties of
the State Roads Commission contemplated the establishment

and maintenance of an extensive and connected system of
state highways, which would afford safe and convenient ave-
nues of communication, by automobiles, trucks, and horse-
drawn vehicles, between the several parts of the state for the
benefit, profit, and convenience of the whole people.  To exe-
cute so extensive and important a plan, it was essential not
only that the agency charged with the duty of carrying it out
should have the power to locate the highways incorporated in
the system in the first place, but to relocate them when and
as changed conditions made such relocation desirable for the
efficiency and highest utility of the entire system.  It may be
that the right to abandon a road once established, and to estab-
lish another in lieu thereof, is a power of great breadth and
importance, but nevertheless, it is administrative rather than
essentially legislative in character, and one which has almost
uniformly been delegated by the Legislature of this State to
municipal and other administrative governmental agencies.
And to have required express and specific legislative sanction
for every change in the location of a state road, when in the
judgment of the State Roads Commission such change was
necessary to straighten or shorten a road, to eliminate curves,
or promote the general convenience or safety, would have been
obviously impracticable, and would have made the efficient
administration of the duties imposed by the act impossible.
For that compelling reason the power to make such changes
was delegated to the State Roads Commission.

Assuming that the State Roads Commission had the
power to abandon and relocate the Conowingo bridge and
the highway approaches thereto, the next question is whether
the several parties to the agreement for effecting that relo-
cation had the power to execute it.

The petition alleges that the Conowingo Bridge Company
granted and conveyed to the State Roads Commission the
Conowingo bridge with its approaches and appurtenances on
August 22nd, 1911.  It is not denied that as a result of
that conveyance the commission became vested with charge
and control over the bridge, its approaches and appurte-
nances, but the appellants contend that it had no power to

grant away the State's title thereto.    In connection with that question it may be noted that by chapter 368 of the Acts of 1908 the power company was granted the right to acquire "of any person or of any corporation, public or private" all property necessary to construct and maintain its dam, and while the word "person" does not ordinarily include the state, it may (*Words and Phrases,* First and Second Series; *Saranac Land and Timber Co. v. Roberts,* 195 N. Y. 303, 199 U. S. 437), where such an intention is manifest.    That the state has the right to dispose of property which is no longer devoted to a public use can hardly be questioned (25 *R. C. L.* 388), and it has also been held that the right to relocate a highway carries by implication the right to sell the vacated part thereof.    *Patton v. City of Rome,* 124 Ga. 525.    The question before us, however, is not whether the State had the power to dispose of the bridge, but whether it had validly delegated that power to the commission.    The growth and development of boards and commissions as agencies for the administration of varied governmental functions has, with the constantly increasing extent and complexity of governmental activities, been extremely rapid in recent years, but the law as to their precise status and powers cannot be said to be either settled or certain.    It is generally recognized, however, that while such agencies are governmental, they have no powers but such as are expressly delegated to them by the organic or statutory law of the government of which they are a part, or such as are by implication essential to the full and adequate exercise of such express powers.

A singular feature of the legislation creating the State Roads Commission and fixing its power and duties is that there is not found in it a single word which expressly confers upon the commission the right to dispose of, in any way, any part of the property committed to its control, and if such a power exists it must be implied from the general purpose of the acts, and the nature of the powers expressly conferred by them.    In the actual administration of the

duties committed to it, it is inevitable that there should be
a constant accumulation of worn out, disused, or antiquated
property, real and personal, in the hands of the commission,
which is no longer suitable or adapted for its uses, and which
it should be permitted to dispose of to the best advantage,
to enable it to effectively carry out its duty of constructing,
maintaining, and improving a system of state highways.
It is unreasonable to assume that the Legislature intended
that such property must accumulate in the hands of the
commission, as a source of waste and expense, but a more
reasonable inference is that it contemplated as a necessary
incident of its general powers that the commission should
dispose of such property by sale or exchange whenever such
disposition was required for the adequate performance of
its express duties.  And when it authorized the commission
to make all "contracts, agreements or stipulations germane
to the scope of its duties and powers under this act" (section
28, article 19, C. P. G. L.), it must have intended to author-
ize it to dispose of such property.

Without deciding the point, it may be conceded that the
commission has no power to dispose of property actually and
permanently subject to a public use, but that is not this case.
For here the commission is dealing with property which
under the express permission of the Legislature is about to
be so changed that it can no longer be used as a part of the
state highway system, and, so far as the commission is con-
cerned, will be wholly and utterly worthless.  To say that
under such circumstances the commission could not agree
with the power company to accept, in the place of the bridge
and approaches destroyed by the dam, another bridge and
approaches thereto at a location which in its judgment would
adequately serve the public convenience, would be to de-
prive it of power which the Legislature clearly intended it
to have.  And the Legislature in the Act of 1908, ch. 268,
when it authorized the power company to acquire such prop-
erty as it needed for the construction and maintenance of its
dam, from any person or corporation public or private, must

have understood that those words included the State, for it further provided that no property belonging to the State should be acquired by the power company without the assent of the Board of Public Works.

It is also suggested that the power company had no power to make the agreement, but as no reason for that contention has been submitted, and as the subject-matter of the agreement is within the scope of and in furtherance of powers expressly granted to it by the State, we find no force in that contention.

The County Commissioners of Cecil and Harford Counties united in the agreement for the purpose of releasing the power company from any claim for damages which those counties might have against the company, for flooding county roads in the vicinity of the dam. The apparent consideration for that release was the relocation of such roads to the satisfaction of the commissioners of the two counties. It was not only permissible but necessary for them to see that county roads destroyed by conditions which they were powerless to prevent were rebuilt and relocated, so as to best serve the interest of the travelling public, and the execution of the agreement by them was a legitimate exercise of the discretion reposed in them by law. *Riggs v. Winterode,* 100 Md. 439.

The Board of Public Works was necessarily a party under chapter 268 of the Acts of 1908.

The suggestion was made in the bill, but not pressed in this court, that the relocation of the bridge and its approaches deprives the appellants of their property without compensation, and without due process of law. If it did that, it should be prevented, of course, but it has no such effect. Whatever the private rights of abutters may be, the appellants, who are not shown to have such rights, have no vested right to have the bridge and its approaches maintained in its present location, and the vacation or abandonment thereof without compensation to them, under proper authority, does not deprive them of their property without due process of law,

especially where it inflicts upon them no inconvenience or damage not suffered by the public generally. And as it does not appear from the bill that they have suffered any such damage, they are not entitled to compensation, and the relo- cation does not deprive them of their property without due process of law. *Elliott on Roads and Streets,* 461, 1181; *German Lutheran Church v. Baltimore,* 123 Md. 42.

It follows, from what has been said, that in our opinion the allegations of the petition were insufficient to warrant the relief prayed, and it was properly dismissed.

*Order affirmed, with costs.*